CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JAN 2 2019

JULIA C. DUDLEY, CLERK
BY:  s/ MARTHA L. HUPP
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| PATRICIA C., | ) | |
| Plaintiff, | ) | Civil Action No. 4:17-cv-00058 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| NANCY BERRYHILL, | ) | By:    Joel C. Hoppe |
| Acting Commissioner, | ) | United States Magistrate Judge |
| Social Security Administration, | ) | |
| Defendant. | ) | |

Plaintiff Patricia C. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decision denying her application for disability insurance

benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434.

The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 11. Having

considered the administrative record, the parties' briefs, and the applicable law, I cannot find that

substantial evidence supports the Commissioner's denial of benefits. Accordingly, I recommend

that the presiding District Judge reverse the decision and remand the matter for further

proceedings.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her

2

residual functional capacity; and, if not (5) whether he or she can perform other work. *See*

*Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th

Cir. 2017); 20 C.F.R. § 404.1520(a)(4).[1] The claimant bears the burden of proof through step

four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the

claimant is not disabled. *See id.*

## II. Procedural History

In November 2013, Patricia C. filed for DIB claiming that she had been unable to work

for the past month because of anxiety and severe depression, sleep apnea, diabetes, neuropathy,

and hypertension. *See* Administrative Record ("R.") 78, 177–80, ECF No. 18-1. Disability

Determination Services ("DDS"), the state agency, denied her claim initially in June 2014, R.

78–88, and upon reconsideration that October, R. 89–105. On May 18, 2016, Patricia C.

appeared with counsel and testified at an administrative hearing before ALJ Brian Kilbane. *See*

R. 40–71. A vocational expert ("VE") also testified at this hearing. R. 63–70.

ALJ Kilbane issued an unfavorable decision on July 27, 2016. R. 20–35. He found that

Patricia C.'s diabetes mellitus, affective disorder, and attention deficit disorder ("ADD") were

"severe" medical impairments, but that her "history of essential hypertension and peripheral

neuropathy" were nonsevere impairments because the record did "not show these conditions

[could not] be controlled with proper medication use, [were] more than acute symptoms, or

result[ed] in more than minimal work-related limitations." R. 22. At step three, ALJ Kilbane

found that none of Patricia C.'s severe impairments met or medically equaled the relevant

Listings. R. 22–25. As part of this assessment, he also found that Patricia C.'s severe mental

impairments caused "moderate restriction" in her activities of daily living ("ADLs"); "marked

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the
date of the ALJ's written decision.

difficulties" with social functioning; "moderate difficulties" maintaining concentration, persistence, or pace; and one brief "episode of decompensation" related to a psychiatric hospitalization in October 2013. *See id.* (citing R. 203–10, 231, 272–76).

ALJ Kilbane then evaluated Patricia C.'s residual functional capacity ("RFC") based on all of her impairments. *See* R. 25–33. He found she could perform "a range of medium work"[2] that involved at most "occasional" climbing of ladders, ropes, and scaffolds, and "frequent" stooping, kneeling, crouching, crawling, and climbing ramps/stairs. R. 25. She also could "perform simple, unskilled work on a sustained basis in a competitive work environment where there [was] no more than occasional interaction with the general public" and "maintain her concentration, persistence, and pace for 2 hours before taking a break, and she [could] do that repeatedly to complete an 8-hour workday." *Id.* These mental limitations ruled out Patricia C.'s return to her past work as a nurse and medical case manager. *See* R. 33–34, 64–65. Finally, based on this RFC finding and the VE's testimony, ALJ Kilbane concluded that Patricia C. was not disabled after October 2013 because she still could perform certain medium, unskilled occupations that represented a significant number of jobs available both nationwide and in Virginia. *See* R. 34–35, 64–66.

When Patricia C. asked the Appeals Council to review ALJ Kilbane's decision, she also submitted a March 31, 2016 treatment note from podiatrist Nathan Young, N.P.D., documenting "generalized soreness to touch" with "diminished" proprioception, sensation, and protective threshold on examination of her feet. *See* R. 2 (citing R. 72–77). The Appeals Council appears to have accepted Dr. Young's examination note as "additional evidence" related to the period at

---

[2] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing 25 pounds," 20 C.F.R. § 404.1567(c), and "standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday" with intermittent sitting during the remaining two hours, SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). *See* R. 25, 33–34 (citing R. 64–65, 98–99).

issue, *see* R. 2, 8–9 (citing 20 C.F.R. § 404.970 (2017)), but concluded that the information did

"not show a reasonable probability that it would change the outcome of the [ALJ's] decision," R.

2. *See* 20 C.F.R. § 404.970(a)(5), (c) (2017). Therefore, the Appeals Council "did not consider

and exhibit this evidence," R. 2, in determining whether to grant or deny Patricia C.'s request for

review.[3] *See* R. 1–2, 8–9; 20 C.F.R. § 404.970(a)(5), (b) (2017). The Appeals Council ultimately

declined to review ALJ Kilbane's decision, R. 1–5, and this appeal followed.

III. Discussion

Patricia C.'s arguments on appeal generally impugn the ALJ's RFC assessment. *See*

---

[3] Nonetheless, the Commissioner included Dr. Young's treatment note in the "copy of the transcript of the record" filed with this Court, 42 U.S.C. § 405(g), and certified that the documents contained therein "constitute a full and accurate transcript of the entire record of proceedings relating to this case," Certification, ECF No. 18-1, at 1. *See* 42 U.S.C. § 405(g) ("[T]he Commissioner . . . shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based."). Even more confounding, Dr. Young's treatment note, R. 75–77, appears *after* ALJ Kilbane's written decision and the transcript of testimony given at the administrative hearing, R. 20–39, 40–71, both of which in the usual course are part of "the transcript of the record" the Court must consider at this stage of the proceedings, 42 U.S.C. § 405(g). The Commissioner's practice of mixing into the certified copy of the record evidence that her agency has expressly refused to "consider and exhibit," R. 2; *see* HALLEX § I-3-5-20 ¶ C, 1993 WL 643143 (rev. May 1, 2017), presents an awkward procedural posture for judicial review. *See Wooding v. Comm'r of Soc. Sec.*, No. 4:10cv6, 2010 WL 4261268, at *2–6 (W.D. Va. Oct. 29, 2010) (Kiser, J.) (explaining the differences in the court's statutory authority to review the Commissioner's final decision under sentence four versus sentence six of 42 U.S.C. § 405(g) (citing *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93 (4th Cir. 1991) (en banc)); *cf. Daley v. Comm'r, Soc. Sec.*, 741 F. App'x 964, 964–65 (4th Cir. 2018) (Mem. Op.) (noting the "significant and material differences between" sentence four and sentence six, including the permissible scope of judicial review under each sentence, and vacating district court's remand order where the panel could not determine which sentence the district court had relied upon in remanding the case).

In a different case, I might now have to choose which part of § 405(g)'s text—sentence four or sentence six—governs this Court's authority to review the Commissioner's final decision and to dispose of the action. *See Daley*, 741 F. App'x at 964–65. The parties' briefs do not address this important question. Nevertheless, because I find that the ALJ's analysis of the *original* record was so facially deficient that "the reviewing court has no way of evaluating the basis for the ALJ's decision," *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013), I need not resolve this question today. Should the decision be reversed and the case remanded under sentence four, as I recommend, the Commissioner will have the opportunity to consider any issues presented by the additional evidence. *See* 20 C.F.R. § 404.983 (2018). In the future, the Court welcomes the parties' input on how best to proceed under § 405(g) when the Commissioner files a certified transcript of the record of the underlying administrative proceedings that contains evidence the Appeals Council has explicitly declined to accept, consider, and/or incorporate into that record.

*generally* Pl.'s Br. 13–21, ECF No. 22. A claimant's RFC represents her "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis" despite her medical impairments, including those that are not severe. SSR 96-8p, 1996 WL 374184, at *2, *5 (July 2, 1996) (emphasis omitted); *see* 20 C.F.R. § 404.1545. It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined functionally limiting effects of impairments that are supported by the medical evidence or the claimant's credible reports of pain or other symptoms, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). "This RFC assessment is a holistic and fact-specific evaluation," *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017), which must reasonably account for any functional limitations the ALJ identified at steps two or three of his decision, *see Mascio*, 780 F.3d at 638–39 (step three); *Ashcraft v. Colvin*, No. 3:13cv417, 2015 WL 9304561, at *8–10 (W.D.N.C. Dec. 21, 2015) (step two). The ALJ's written decision must also "include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion" in the RFC assessment, *Mascio*, 780 F.3d at 636, and explaining why he discounted any "obviously probative" evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977), that supported the individual's claim for disability benefits, *Ezzell v. Berryhill*, 688 F. App'x 199, 200 (4th Cir. 2017).

A.    *Summary*

Patricia C. alleged disability from both physical and mental impairments. As for her physical impairments, Patricia C. and her treating endocrinologist, Carl Bivens, M.D., contended that uncontrolled diabetes and painful neuropathy in both feet prevented her from lifting/carrying more than about ten pounds and standing/walking for more than fifteen minutes at one time. *See*

R. 51, 53, 55, 208, 513–14, 518–19. Dr. Bivens attributed these limitations to "neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station." *See* R. 513. At the administrative hearing, Patricia C. testified that her feet hurt all day and it felt like she was "walking on bumblebees" whenever she stayed on her feet "for a while." R. 52. Luc Vinh, M.D., and Lewis Singer, M.D., the DDS physicians who reviewed Patricia C.'s records in June and October 2014, respectively, agreed that her exertional capacities were "[l]imited due to diabetes with most recent A1C of 7.4,"[4] but opined that she could still lift/carry up to 50 pounds, frequently lift/carry 25 pounds, and stand/walk for about six hours during a normal eight-hour workday. R. 84–85, 98–99.

As for her mental impairments, Patricia C. and her treating psychiatrist, Conrad Daum, M.D., asserted that ADD and bipolar disorder with depression and obsessive-compulsive tendencies caused "moderate" to "extreme" limitations in her abilities to remember information and follow simple instructions, maintain attention and concentration, and stay on task long enough to complete simple tasks. *See* R. 46–50, 94, 208–09, 510–12, 515–17. Patricia C. testified that she was depressed every day, but two or three days a month she suffered from more severe unpredictable "depressive episodes" that lasted three or four days at a time. R. 47. Sandra Francis, Psy. D., the DDS psychologist who reviewed Patricia C.'s records in October 2014, opined that her severe ADD and depression caused "moderate" limitations in her abilities to

---

[4] A person with diabetes has too much glucose in her blood. *See* Mayo Clinic, *Diabetes*, http://www.mayoclinic.org/diseases-conditions/diabetes/basics/definition/con-20033091 (rev. Aug. 8, 2018). "The A1C test is a simple blood test" used to gauge how well the person is managing her diabetes overall. *See* Mayo Clinic, *A1C Test: Definition*, http://www.mayoclinic.org/tests-procedures/a1c-test/basics/definition/prc-20012585 (rev. Apr. 5, 2018). Results reflect the person's average blood-sugar level for the past two or three months by measuring the percentage of hemoglobin coated with sugar. *See id.* "[A]n A1C level of 7 percent or less is a common treatment target," but "[h]igher targets of up to 8 percent may be appropriate for some individuals." *Id.*

"remember locations and work-like procedures," complete tasks within a schedule and maintain

acceptable attendance, maintain attention and concentration for extended periods, sustain an

ordinary routine without special supervision, work with or around other people without being

distracted by them, and "complete a normal workday and workweek without interruption from

psychologically based symptoms and to perform [tasks] at a consistent pace without an

unreasonable number or length of breaks." R. 100–01 (citing R. 94).[5] Dr. Francis based this

detailed functional assessment on Patricia C.'s own description of her "mental ADLs" in

September 2014, *see id.*, including that she had "great difficulty remembering" to take her

medications, she could "only pay attention for about 10–15 minutes," she was easily

"overwhelmed" by basic household chores, and she often got "lost while driving a very familiar

route," R. 94. *See, e.g.*, R. 100 ("Explain in narrative form the presence and degree of specific

understanding and memory capacities and/or limitations: (see mental ADLs)"). Ultimately, Dr.

Francis concluded that Patricia C. could "perform unskilled work with limited public contact,"

"adjust to a work situation," and "interact with supervisors and co-workers in a work setting." R.

102.

B.    *The ALJ's Decision*

ALJ Kilbane considered Patricia C.'s medical impairments and alleged limitations

throughout his written decision. *See* R. 22–33. At step two, he found that her diabetes, affective

disorder, and ADD were "severe" impairments because they caused "more than minimal

limitations in [her] ability to perform basic work activities," R. 22, which, according to the

regulations, include physical functions like lifting/carrying and standing/walking and mental

functions like following simple directions, responding appropriately to other people, and dealing

---

[5] The DDS psychologist who reviewed Patricia C.'s records in June 2014 opined that her ADD and
affective disorder were nonsevere mental impairments. *See* R. 82–83.

with changes in a routine work setting, 20 C.F.R. § 404.1521(b)(1). He did not explain his

conclusion that Patricia C.'s peripheral neuropathy caused at most minimal limitations in her

physical capacities. R. 22.

At step three, ALJ Kilbane concluded that Patricia C.'s severe diabetes did not meet or

equal the relevant Listings because she had "not had any complications from her diabetes" and

the disorder was "treated successfully with medications." R. 23 (citing Exs. 2F, 3F, 5F, 11F,

13F). ALJ Kilbane also concluded at step three that Patricia C.'s severe mental impairments

caused "moderate difficulties" in her overall ability to maintain concentration, persistence, or

pace, *id.*, which necessarily establishes some deficit in Patricia C.'s "ability to sustain focused

attention and concentration" long enough "to permit the timely and appropriate completion of

tasks commonly found in work settings," 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(3); *see*

*Petty v. Colvin*, 204 F. Supp. 3d 196, 206 (D.D.C. 2016). In making this finding, ALJ Kilbane

relied exclusively on Patricia C.'s subjective reports that "she needed special reminders to take

care of personal needs and to go places," she "could pay attention for 'maybe 5 minutes' [and]

did not finish what she started," she had to "re-read written instructions 'dozens of times'" and

sometimes struggled to follow spoken instructions, and she felt compelled to "count everything"

in her environment, such as trees, signs, and telephone poles. R. 23 (citing R. 205–09).

ALJ Kilbane then summarized Patricia C.'s hearing testimony, R. 26, and much of the

medical evidence related to her impairments and alleged functional limitations, R. 27–28, 31–33.

"With respect to [her] physical impairment," ALJ Kilbane noted at the outset that Patricia C. had

"a history of diabetes that [was] relatively well-controlled" under a specialist's care. R. 27. He

discussed specific treatment notes showing that Patricia C. usually had unremarkable physical

examinations (including normal gait with intact vibratory sensation and proprioception in both

feet) and often denied suffering significant symptoms or functional limitations from diabetes and neuropathy. *See* R. 27, 28–29 (citing R. 316–19, 324–27, 416–22, 493, 518–23, 528, 603–23). He also acknowledged that Patricia C. occasionally complained to Dr. Bivens about burning pain, numbness, and tingling in her feet and exhibited "diminished" vibratory sensation on examinations, particularly towards the end of the relevant period. R. 27 (citing R. 520–23, 524–27, 528–31, 533–36). "Consequently," ALJ Kilbane concluded at the end of this summary, Patricia C. was "limited to a range of medium work with additional postural limitations as a result of her diabetes mellitus." R. 27. Later in his decision, ALJ Kilbane also noted that "repeated physical examinations ha[d] failed to reveal" significantly decreased range of motion "as would be expected" given the severe functional limitations Patricia C. alleged. R. 30. He did not mention treatment records from the spring of 2016 showing Patricia C. reported pain in the lower back and legs that was exacerbated by standing, walking, lifting, and doing housework and documenting "50% global limitation of motion in the lumbar spine secondary to pain" on examination. R. 649, 655, 658.

ALJ Kilbane also considered the conflicting medical opinions about Patricia C.'s physical capacities. He gave "little weight" to Dr. Bivens's opinions that diabetes and painful neuropathy severely limited Patricia C.'s ability to lift, stand, and maintain regular workplace attendance, *see* R. 513–14, 518–19, because he concluded those opinions were not balanced, objective, or "consistent with the evidence of record as a whole," R. 32–33. He explained that "nothing in the record reflect[ed] that she would miss any time" from work and that "none of [Dr. Bivens's] treatment notes indicate[d] any problems with [her] ability to lift." R. 33. On the contrary, Dr. Bivens's treatment notes "generally" showed that Patricia C. "reported no problems as a result of her diabetes." *Id.* (citing Exs. 2F, 5F, 11F). ALJ Kilbane gave "great weight" to Dr. Vinh's and

Dr. Singer's opinions that Patricia C. could perform "at least a range of medium work" because their assessments were balanced, objective, and "consistent with and supported by the other evidence of record." *Id.* (citing R. 84–86, 96, 98–99). He did not identify what "other evidence" or parts of the record he found consistent with these opinions.

ALJ Kilbane's assessment of Patricia C.'s mental impairments and limitations followed a similar pattern. He noted at the outset that, while Patricia C. had "a history of depression and ADD" with one psychiatric hospitalization, "the evidence of record reflect[ed] that the findings on examination ha[d] been minimal." R. 27. On October 18, 2013, Patricia C. was hospitalized with passive suicidal ideation and increasing depression and obsessive-compulsive tendencies. R. 273. Her "counting compulsions," which she described as an obsessive need to count items in her environment, had increased to the point that she was "driving dangerously" and swerving as she tried to count the trees and light poles around her. *Id.* Patricia C. appeared "clearly depressed, despondent, [and] hopeless" with a somber mood and flat affect. *Id.* Her memory was intact, and her attention and concentration were "fair." *Id.* The hospital psychiatrist admitted her for suicide observation and changed her antidepressant medications. R. 272–73. She was discharged on October 24, having "accomplished maximum hospital benefit" in individual and group milieu therapy. R. 275.

In November 2013, Patricia C. entered outpatient counseling at Piedmont Community Services ("PCS") to help her manage psychological symptoms, including depression, anxiety, "[u]nexplained frequent changes in mood," racing thoughts, "[d]ifficulty with memory, concentration, or decision making," recurring thoughts of death, and compulsive behaviors. R. 446; *see generally* R. 443–91 (Ex. 4F), 555–71, 577–80 (Ex. 12F). On January 2, 2014, PCS psychiatrist Don Tessman, M.D., observed that Patricia C. was "dressed neatly and

appropriately," had "organized and coherent" speech with "no flight of ideas or loose associations," and did not exhibit any "obvious" signs of auditory or visual hallucinations. R. 463. She was not actively suicidal on that date, but she admitted occasional passive suicidal ideation. *Id.* Counseling progress notes mostly document Patricia C.'s subjective reports about her symptoms, daily activities, family relationships, and stressful life events, as well as the counselor's advice about how Patricia C. could cope with her symptoms. *See, e.g.*, R. 450, 461, 465, 468, 477, 479, 568, 570, 577. For example, when Patricia C. mentioned in December 2013 that she had not been "able to get back to her hobby of bead and jewelry making," the counselor encouraged her to "spend 10 minutes 3 times a week just sorting out her jewelry as a way of moving forward." R. 450. Similarly, when Patricia C. reported difficulty staying on task or concentrating in March 2015, the counselor suggested that she try to fold "one small basket" of clothes per day "so as not to get overwhelmed mentally or physically." R. 568.

Patricia C. also saw Dr. Daum at PCS for routine medication management between February 2014 and December 2015. *See generally* R. 472–92, 505–09, 538–602 (Exs. 4F, 6F, 12F). At the initial visit on February 24, Dr. Daum "spent considerable time" with Patricia C. in an effort to understand her mental health history. R. 475. She complained of mood swings, compulsive counting, and "moderate" difficulty paying attention and completing everyday projects. R. 472. On exam, Dr. Daum observed that Patricia C.'s speech was spontaneous; her thought processes were appropriate and logical, but also marked by "abnormal" obsessive thoughts; her judgment and insight were "good"; her mood was depressed and anxious; her recent and remote memory were "good for [her] history"; her attention span and concentration were "good here"; and her use of language was "satisfactory." R. 474. He diagnosed bipolar disorder and ADD and prescribed medications for depression, mood swings, and anxiety. R.

474–75. At her next visit in April, Patricia C. noted that her ADD significantly interfered with her ability to concentrate. R. 481. Dr. Daum responded that they "need[ed] to focus first on her OCD before [they] could begin to pursue this other problem." *Id*. Dr. Daum documented essentially the same findings on mental-status examinations in April, July, and October 2014 as he had at the initial visit, and adjusted Patricia C.'s medications as appropriate. *See* R. 482–84, 506–08, 539–42.

On January 14, 2015, Patricia C. told Dr. Daum that she was again contemplating suicide. R. 547, 551. On exam, she endorsed suicidal ideation and appeared depressed and anxious. R. 551. Her memory, concentration, use of language, and orientation to time, place, and person were all noted to be "OK." *Id.* Dr. Daum prescribed Risperdal for mood swings and continued Patricia C.'s other medications. R. 552. Dr. Daum noted similar findings on mental-status exams in April, July, September, and December 2015. R. 573, 582, 587, 597. Patricia C. did not endorse any abnormal thoughts on these visits. *Id.* A more detailed psychiatric evaluation dated November 11, 2015, shows that Patricia C. exhibited an "[e]uthymic, [d]yspohoric" mood, but otherwise was well groomed and cooperative, had normal speech and thought patterns, exhibited "intact" memory and "adequate" concentration, and appeared "comfortable." R. 594. At her next visit in December, Dr. Daum prescribed Ritilan for ADD and noted improvement in Patricia C.'s overall condition. R. 599–600.

In summarizing these treatment records, ALJ Kilbane noted that Patricia C.'s "[m]ental status exams [showed] her mood ranged from depressed and/or anxious to normal, but she was neat and appropriately dressed with organized and coherent speech, no flight of ideas or loose associations, hallucinations, or suicidal ideation, and [had] normal memory, attention span, and concentration." R. 28 (citing Ex. 4F). ALJ Kilbane also cited several pages from Dr. Bivens's

notes indicating that Patricia C. had reported feeling "much better" or "good," *id.* (citing R. 316–
19, 327); "denied any anxiety, depression, difficulty sleeping, compulsive behaviors, or memory
problems," R. 28, 29 (citing R. 316–19, 493–96, 521, 526, 530, 534); and appeared "alert" on
physical examinations, R. 28 (citing R. 318, 326–27). "Consequently," ALJ Kilbane concluded
at the end of this summary, Patricia C. was "limited to simple, unskilled work with no more than
occasional interaction with the general public and where she can maintain her concentration,
persistence, and pace for 2 hours before taking a break as a result of her depression and ADD."
R. 28; *see* R. 25.

Later in the RFC assessment, ALJ Kilbane gave "little weight" to Dr. Daum's treating-
source medical opinions identifying moderate to extreme mental limitations because he
concluded that they contradicted the psychiatrist's "own treatment notes (and those of other
physicians) generally reflect[ing] normal attention and concentration [with] intact recent and
remote memory," and there were "a number of visits" to Dr. Bivens's endocrinology clinic
where Patricia C. "denied any depression, anxiety, compulsive behaviors, or other mental
issues." R. 32 (citing R. 272–76, 521, 526, 530, 534; Exs. 2F, 4F, 5F, 6F, 12F). He also found
that Dr. Daum "seemed to uncritically accept as true most, if not all, of what" Patricia C. told
him about her symptoms and functional limitations and that his medical opinions "apparently
relied quite heavily on" her subjective statements, which ALJ Kilbane had already concluded
were not entirely credible. *Id.* ("Yet, as explained elsewhere in this decision, there exist good
reasons for questioning the reliability of the claimant's subjective complaints."). ALJ Kilbane
gave "great weight" to Dr. Francis's conclusion that Patricia C. could perform "unskilled work
with limited public contact," "adjust to a work situation," and "interact with supervisors and co-
workers in a work setting" because he concluded that her assessment was "balanced and

14

objective, consistent with the overall evidence of record, and supported the residual functional

capacity outlined in [the ALJ's] decision." *Id.* (citing R. 102). He did not identify which

evidence or parts of the record he found consistent with this assessment.

C.    *Analysis*

"A necessary predicate to engaging in substantial evidence review is a record of the basis

for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found

credible and why, and specific application of the pertinent legal requirements to the record

evidence." *Radford*, 734 F.3d at 295 (internal citation omitted). The ALJ does not need to

discuss every piece of relevant evidence, but he "must evaluate the record fairly," *Golembiewski*

*v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (per curiam), and provide enough "analysis of the

evidence to allow the [reviewing] court to trace the path of his reasoning," *Diaz v. Chater*, 55

F.3d 300, 307 (7th Cir. 1995). *See Lewis*, 858 F.3d at 869; *Mascio*, 780 F.3d at 636–38; *Hines*,

453 F.3d at 566 (citing *Diaz*, 55 F.3d at 307). Similarly, it is not enough for the ALJ to simply

summarize the relevant evidence if he then fails to explain how he resolved material ambiguities

or conflicts in the record and why the credited evidence supports his findings and conclusions.

*See Woods v. Berryhill*, 888 F.3d 686, 695 (4th Cir. 2018); *Monroe v. Colvin*, 826 F.3d 176, 191

(4th Cir. 2016). In other words, the "ALJ's failure to 'build an accurate and logical bridge from

the evidence to his conclusion'" that the claimant is not disabled typically "constitutes reversible

error." *Lewis*, 858 F.3d at 868 (quoting *Monroe*, 826 F.3d at 189).

Under this standard, too "[m]uch of the ALJ's RFC assessment was devoted to summary"

and not enough to meaningful analysis. *Lacek v. Colvin*, Civ. Action No. CBD-13-2046, 2014

WL 2865992, at *8 (D. Md. June 23, 2014); *see also Boston v. Barnhart*, 332 F. Supp. 2d 879,

888 (D. Md. 2004) (reversing and remanding where the ALJ set out "a detailed summary of the

medical evidence, but fail[ed] to engage in any discussion as to how this evidence support[ed]

[the] RFC determination"). As for Patricia C.'s exertional capacities, ALJ Kilbane concluded

that she could

> perform "medium work" and summarized evidence that he found credible, useful,
> and consistent. But the ALJ never explained how he concluded—*based on this
> evidence*—that [Patricia C.] could actually perform the tasks required by
> "medium work," such as lifting up to 50 pounds at a time, frequently lifting or
> carrying up to 25 pounds, or standing or walking for six hours.

> *Woods*, 888 F.3d at 694 (quoting SSR 83-10, 1983 WL 31251, at *1); *see* R. 27. Instead,

he summarily adopted the two DDS physicians' opinions that Patricia C. could meet these

physical demands, R. 84–85, 98–99, without explaining why he found those opinions to be

"consistent with the overall evidence of record" and "supported by the other evidence of record,"

R. 33. *See Monroe*, 826 F.3d at 191 (the ALJ's failure to "specify what 'objective evidence' or

what aspects of Monroe's 'treatment history' he was referring to" when weighing various

medical opinions precluded meaningful judicial review). "As such, the analysis is incomplete

and precludes meaningful review."[6] *Monroe*, 826 F.3d at 191. ALJ Kilbane made the same basic

errors in failing to explain how he concluded, based on the evidence he recounted in his

summary of the medical record, that Patricia C. actually retained the mental capacity to perform

the specific demands of "unskilled work on a sustained basis in a competitive work

---

[6] An adequate explanation of Patricia C.'s remaining exertional abilities was particularly important in this
case because, as Patricia C. correctly points out, an RFC finding that included slightly more restrictive
limitations on her abilities to lift/carry or to stand/walk could have supported a conclusion that she was
disabled during the relevant time. Pl.'s Br. 15–16 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 § 202.06
(directing a finding of "disabled" for a person of "advanced age" with at least a high school education
whose severe physical impairments restrict her from the full range of "light" work)). Conversely, "[t]he
functional capacity to perform medium work represents such substantial work capability that . . . a finding
of disabled is ordinarily not warranted" even when the person is of "advanced age" and has very limited
education or work history. 20 C.F.R. pt. 404, subpt. P, app. 2 § 203.00(b).

environment" as long as she had at most occasional interaction with the general public.[7] *See* R. 25, 27–28, 33.

Even more problematic, ALJ Kilbane did not provide a sufficiently clear or detailed discussion of how he concluded Patricia C. "can maintain her concentration, persistence, and pace for 2 hours before taking a break from work and she can do [this] repeatedly to complete an 8-hour workday." R. 25. The lack of adequate explanation on that point alone warrants reversal and remand for the Commissioner to close the following gaps in the ALJ's analysis of Patricia C.'s mental abilities and limitations. *See Mascio*, 780 F.3d at 636–40; SSR 96-8p, 1996 WL 374184, at *2, *4, *7.

First, ALJ Kilbane expressly credited Patricia C.'s subjective reports that she "could pay attention for 'maybe 5 minutes' [and] did not finish what she started" to support his step-three finding that she had "moderate difficulties" maintaining concentration, persistence, or pace. R. 24 (citing R. 205–09). Yet, he concluded in the subsequent RFC determination that Patricia C. could pay attention for two hours at one time before taking a break from her work and could do this "repeatedly" in order to complete a normal eight-hour workday. R. 25. ALJ Kilbane's decision provides no explanation of how (or even whether) he resolved this inherent discrepancy. *See Claiborne v. Comm'r*, No. SAG-14-1918, 2015 WL 2062184, at *4 (D. Md. May 1, 2015)

---

[7] "'Unskilled work' is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher v. Barnhart*, 181 F. App'x 359, 364 n.3 (4th Cir. 2006) (quoting 20 C.F.R. § 404.1568(a)). "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56857, at *4 (Jan 1, 1985). Notably, an RFC limiting Patricia C. to "simple, unskilled work" does not necessarily account for ALJ Kilbane's step-three finding that she had "moderate difficulties" maintaining concentration, persistence, or pace, R. 24–25, because "the ability to perform simple tasks differs from the ability to stay on task," *Mascio*, 780 F.3d at 638. "Only the latter limitation [will] account for a claimant's limitation in concentration, persistence, or pace." *Mascio*, 780 F.3d at 638.

(stating that the ALJ's findings at steps two and three should represent a well-reasoned

consideration of the evidence and that these steps are "not simply an opportunity to give the

claimant the benefit of the doubt at one step while taking it away at the next step"); *cf. Sizemore*

*v. Berryhill*, 878 F.3d 72, 81 (4th Cir. 2017) (affirming denial of benefits where the ALJ's

written decision provided a logical link, supported by substantial evidence in the record, between

his step-three findings and his mental RFC determination).

Second, these specific RFC findings do not appear to be grounded in any record evidence

logically related to Patricia C.'s severe mental impairments. *See Mascio*, 780 F.3d at 636; SSR

96-8p, 1996 WL 374184, at *3, *7. For example, although Dr. Francis opined that Patricia C.

could "perform unskilled work with limited public contact," R. 102, she did not say whether

Patricia C. could maintain attention or persist in her work for a specific amount of time before

needing to take a break. *Cf. Sizemore*, 878 F.3d at 80–81 (explaining that psychologist's opinion

that the claimant "would generally be able to maintain attention for at least two hours at a time as

needed to do simple, routine tasks" provided substantial support for ALJ's RFC finding that the

claimant could "stay on task" while performing simple work (quotation marks and alterations

omitted)). Indeed, Dr. Francis found that Patricia C. was "moderately limited" in her abilities "to

maintain attention and concentration for extended periods" and "to perform at a consistent pace

without [taking] an unreasonable number and length of rest periods." R. 100–01. Dr. Daum

opined in March 2015 that Patricia C. would be off task "100%" of the time during an average

workday and could never "perform at a consistent pace without [taking] an unreasonable number

of rest periods," R. 515–16, but the ALJ rejected those "extreme limitations" as inconsistent with

the treating psychiatrist's own progress notes, R. 32. In the absence of medical opinion or other

specific evidence clearly identifying a particular limitation, or an adequate explanation by the

18

ALJ, I am "left to guess about how the ALJ arrived at his conclusion[]," *Mascio*, 780 F.3d at

637, that Patricia C. could maintain adequate concentration, persistence, and pace in two-hour

shifts throughout an eight-hour workday.

Third, ALJ Kilbane's rationale for the differing weights he assigned to Dr. Daum's and

Dr. Francis's medical opinions is not entirely clear. He gave little weight to Dr. Daum's opinions

in part because he believed that the treating psychiatrist "*apparently* relied quite heavily on the

subjective report of symptoms and limitations provided by [Patricia C.], and *seemed to*

uncritically accept as true most, if not all, of what [she] reported." R. 32 (emphasis added). ALJ

Kilbane did not cite any evidence in the record to support this rationale. *Cf. Eggleston v. Colvin*,

No. 4:12cv43, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013) (explaining that the ALJ's

articulated reasons for discounting a claimant's subjective statements "must be grounded in the

evidence" of record and "cannot be based on an intangible or intuitive notion about" their

reliability); *Hall v. Astrue*, No. 7:07cv590, 2008 WL 5455720, at *4 (W.D. Va. Dec. 31, 2008)

(recommending reversal where the ALJ impermissibly discounted a "treating physician's opinion

based on unsupported conjecture" that the physician was biased in his patient's favor), *adopted*

*by* 2009 WL 187984 (W.D. Va. Jan. 23, 2009). Yet, he gave "great weight" to Dr. Francis's

opinion, R. 33, despite the reviewing psychologist's *explicit* admission that her assessment relied

on Patricia C.'s "mental ADLs" and functional limitations as Patricia C. described them to a

DDS employee in September 2014, *see* R. 100–02 (citing R. 93–94). Indeed, ALJ Kilbane did

not even acknowledge this fact. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 764 (W.D. Va.

2002) ("A district court will no[t] . . . revisit the ALJ's resolution of conflicting evidence.

However, if the ALJ appears, without stating a reason, to have credited some probative evidence

over other evidence or to have ignored evidence altogether, a remand or reversal may be

necessary."); *cf. Golembiewski*, 322 F.3d at 917 (explaining that "it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence" when it appears he "ignore[d] an entire line of evidence that his contrary to the ruling").

Similarly, although ALJ Kilbane credited Dr. Francis's overall conclusion that Patricia C. could perform "unskilled work with limited public contact" despite her severe mental impairments, R. 33 (citing R. 102), he did not mention Dr. Francis's more detailed findings that those same impairments "moderately limited" Patricia C.'s abilities to "remember locations and work-like procedures," to complete tasks within a schedule, to maintain attention and concentration for extended periods, and to "complete a normal workday and workweek without interruption from psychologically based symptoms and to perform [tasks] at a consistent pace without [taking] an unreasonable number or length of breaks," R. 100–01. Thus, it is not clear whether ALJ Kilbane rejected Dr. Francis's more specific restrictions while crediting her conclusion about what Patricia C. could still do, or whether he thought that limiting Patricia C. to "simple, unskilled work" fully accounted for Dr. Francis's opinions that she had moderate limitations performing at a consistent pace and maintaining attention and concentration for extended periods. R. 25, 33; *see Davis v. Colvin*, No. 4:13cv35, 2014 WL 3890495, at *1, 12–13 (W.D. Va. Aug. 7, 2014) (reversing and remanding where the ALJ committed the same error). The Court cannot meaningfully review the mental RFC determination unless the ALJ explains this ambiguity. *See, e.g., Bradley v. Berryhill*, No. 4:16cv26, 2017 WL 4707035, at *3 (W.D. Va. Oct. 19, 2017) ("In light of [the doctor's] *entire* opinion, the ALJ's error falls squarely in line with the Fourth Circuit's conclusion in *Mascio*: 'the ability to perform simple tasks differs from the ability to stay on task.'" (quoting 780 F.3d at 638)).

Finally, ALJ Kilbane's discussion of Patricia C.'s mental illness gives the impression that he unfairly "seize[d] on insignificant inconsistencies in the treatment record while overlooking the record's broader import." *Testamark v. Berryhill*, 736 F. App'x 395, 399 (4th Cir. 2018). For example, despite crediting Patricia C.'s subjective statements describing significant difficulty paying attention and recalling information at step three, R. 24, ALJ Kilbane later concluded that Patricia C.'s "allegations that her conditions affected her abilities to memorize, concentrate, and understand" were "contradicted by" an unknown DDS employee's note that he or she did not "observe[] or perceive[] difficulties" in Patricia C.'s capacities to understand, concentrate, or answer questions during one teleclaim interview in December 2013, R. 29 (citing R. 191). ALJ Kilbane did not explain these inconsistent findings. Even if he had explained the discrepancy, however, the Court is skeptical whether an ALJ reasonably could credit a DDS employee's lay opinion based on a single telephone conversation while at the same time discounting a treating psychiatrist's medical opinions. R. 29, 33; *cf. Woods* (expressing "skeptic[ism] about the ALJ's rationale for according great weight" to a DDS physician's medical opinion "while at the same time discounting" the treating-source medical opinions). The ALJ also cited "a number of visits" to Dr. Bivens's endocrinology clinic in 2015 where Patricia C. "denied any depression, anxiety, compulsive behaviors, or other mental issues," R. 32 (citing R. 521, 526, 530, 534), but he did not explain how he weighed that generic information against Dr. Daum's more detailed treatment notes showing Patricia C. complained of worsening depression, suicidal ideation, and compulsive tendencies during the same time, *see* R. 551, 555–56, 573, 582, 587, 597. *Cf. Lewis*, 858 F.3d at 869 ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)).

Moreover, "[b]ecause symptoms of mental illness may wax and wane over the course of treatment," the fact that Patricia C. exhibited adequate attention or intact memory "on certain specific occasions is not [necessarily] inconsistent with the conclusion that she is unable to work." *Testamark*, 736 F. App'x at 398–99.

* * *

The Court takes no position on whether Patricia C. should be awarded disability benefits. Rather, the issue "here arises from a problem that has become all too common among [ALJ] decisions challenged in this court—a problem [agency] decision makers could avoid" if they would just "show [their] work." *Patterson*, 846 F.3d at 663 (capitalization altered). ALJ Kilbane's written analysis in this case was so conclusory, and at points materially incomplete, that I am "left guess about how the ALJ arrived at his conclusions" on Patricia C.'s ability to perform relevant functions on a sustained basis in a competitive workplace. *Mascio*, 780 F.3d at 637. Thus, "because [I] cannot gauge the propriety of the ALJ's RFC assessment, [I] cannot say that substantial evidence supports the [Commissioner's] denial of benefits." *Patterson*, 846 F.3d at 662. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record, explain how any material inconsistencies or ambiguities were resolved at each critical stage of the disability determination process, and provide an accurate, logical description of how specific evidence in the record supports each conclusion in the RFC assessment.

## IV. Conclusion

For the foregoing reasons, I cannot find that substantial evidence supports the Commissioner's final decision. Accordingly, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 23, **REVERSE** the

Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. §

405(g), and **DISMISS** the case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and
Recommendation], any party may serve and file written objections to such
proposed findings and recommendations as provided by rules of court. A judge of
the court shall make a de novo determination of those portions of the report or
specified proposed findings or recommendations to which objection is made. A
judge of the court may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge. The judge may also receive
further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United

States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of

record.

ENTER: January 2, 2019

Joel C. Hoppe
United States Magistrate Judge